THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH CAPECE | : |
| Plaintiff | : |
| v. | :  3:12-CV-1542 |
| | :  (JUDGE MARIANI) |
| HESS MASCHINENFABRIK GmbH & CO. KG | : |
| Defendant | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On May 8, 2012, Plaintiff Capece brought this action in the Luzerne County Court of Common Pleas alleging state-law claims for negligence (Count I), strict product liability (Count II), and breach of warranty (Count III) against Defendant, Hess Maschinefabrik GmbH & Co. KG (hereinafter "Defendant Hess"), for an injury that occurred when a concrete block machine manufactured by Defendant ejected a steel plate onto Capece's ankle. (Compl., Doc. 1-2). Defendant subsequently filed a notice of removal pursuant to 28 U.S.C. § 1446 on August 8, 2012. (Doc. 1).

On March 12, 2014, Defendant moved for summary judgment. (Doc. 29). On December 29, 2014, upon consideration of Defendant's Motion for Leave of Court to File Supplemental Briefing in support of Defendant's pending motion for summary judgment (Doc. 43) and the Pennsylvania Supreme Court's November 19, 2014 decision in *Tincher v.*

*Omega Flex, Inc.*, the parties were granted leave to file supplemental briefs (Doc. 44). The issues have now been fully briefed and Defendant's motion is ripe for decision.

For the reasons set forth below, the motion will be granted in part and denied in part.

## II. STATEMENT OF UNDISPUTED FACTS

The following statement of undisputed facts is drawn from Defendant's Statement Of Material Facts submitted pursuant to Local Rule 56.1 (Doc. 32) and Plaintiff's Answer thereto (Doc. 39).

Defendant Hess is a German corporation that designs and manufactures concrete machines. (Doc. 1-2, ¶¶ 2, 4).

In 2006, Techo-Block purchased an RH-Multimat-2000-2A concrete block machine from Hess (hereinafter "Hess Machine"). (Doc. 32, ¶ 9). Installation of the Hess Machine was completed on August 15, 2007. (*Id.* at ¶ 9). Techo-Block is in the business of manufacturing concrete paving stones and other masonry products. (*Id.* at ¶ 5). Techo-Block contracted with Defendant Hess to design, manufacture, and install concrete producing machinery in Plant 1, of Techo-Block's Pen Argyl, Pennsylvania facility, and, in 2006, purchased the concrete block machine in Plant 2. (*Id.* at ¶¶ 7, 9). The machine is located in a walled-off enclosure (the "Hess Room") within Plant 2 of the Pen Argyl facility. (*Id.* at ¶ 26). The Hess Machine forms concrete products by depositing wet concrete into molds and the molded concrete items are formed on and transported through the machine on steel "boards" or "plates" in the "wet-side" of the Plant. (Doc. 32, ¶¶ 10, 11).

2

Capece began employment with Techo-Bloc on May 3, 2010. (*Id.* at ¶ 4). He was injured on May 25, 2010 when David Hicks, the Hess Machine operator at the control panel, manually discharged a plate onto the conveyor while the Hess Machine was in manual mode. (Doc. 32, ¶ 1; Doc. 1-2, ¶ 10); (Doc. 32, ¶¶ 29, 30). In manual mode, the operator must physically maneuver a joystick to send a plate onto the conveyer. (Doc. 32, ¶ 32). The plate transport will not happen automatically in manual mode. (*Id.* at ¶ 33).

There is a pedestrian catwalk or bridge located outside of the Hess Room. (*Id.* at ¶ 36). The plaintiff was injured when crossing the conveyer belt when a steel plate exited the machine and fractured his left ankle. (*Id.* at ¶ 54; Doc. 39, ¶ 54). Capece alleges his intent in attempting to cross the conveyor was to service the "hopper" on the other side of the conveyer. (Doc. 32, ¶ 36).

After Plaintiff entered through the safety gate and before the accident, he believes that the safety gate was closed behind him by an unknown and unidentified person. (*Id.* at ¶ 59). He believes that from where he was injured he was approximately three feet from the safety gate and he did not observe anyone else standing in close proximity to the safety gate shortly before the accident. (*Id.* at ¶¶ 60, 61).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-1031 (9th Cir. 2001); *see also Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."

4

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## IV. ANALYSIS

Capece alleges state-law claims for negligence (Count I) and strict products liability (Count II). Both claims are premised upon a design defect theory and a failure to warn theory. Capece also alleges a claim for breach of warranty (Count III). Defendant seeks summary judgment on three different grounds. (Doc. 30, p. 2). First, Defendant contends that Capece cannot prove that the concrete machine was defective. Second, Defendant claims the machine was equipped with adequate warnings. Finally, Defendant asserts that Capece's breach of warranty claim is untimely. (*Id.* at 42). Each issue is addressed in turn.

In a strict products liability action, a plaintiff must show that (1) the product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control. *Warnick v. NMC-Wollard, Inc.*, 512 F.Supp.2d 318, 322 (W.D. Pa. 2007) (citing *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998)). To prevail in a negligence action, a plaintiff must plead and prove that (1) the defendant owed a duty of care (2) the breach of which (3) caused (4) damages. *Berrier v. Simplicity Mfg Inc.*, 563 F.3d 38, 61 (3d Cir. 2009). Under either theory, the threshold question is whether the product is in a defective condition. *Warnick*, 512 F.Supp.2d at 323.

On November 19, 2014, while Defendant's motion for summary judgment was pending, the Pennsylvania Supreme Court adopted a new standard of proof to determine

whether a product is in a defective condition in strict liability cases. *See Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014). Under the approach set forth in *Tincher*, a plaintiff may prove that a product is in a defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer (consumer expectations test), or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions (risk-utility test). *Id.* Under either test, whether a product is in a defective condition is a question of fact to be decided by the jury. *Id.*

In the parties' supplemental briefs, they agree that *Tincher* applies to this case. (Doc. 45, p. 5; Doc. 46, p. 2). Capece further agrees that *Tincher's* consumer expectations test is inappropriate and therefore opposes summary judgment only under the risk-utility test. (Doc. 46, p. 4).

## A. Counts I & II: Risk-Utility Test

Capece contends that the failure to equip the Hess Machine with adequate guarding and a catwalk constitutes a design defect under the risk-utility test. (Doc. 40, pp. 1-2; Doc. 46, p. 4).

Under the risk-utility test, a plaintiff must introduce proof of the "probability and seriousness of harm caused by the product."[1] *See Tincher*, 104 A.3d at 335, 406. In

---

[1] Capece argues that as a result of *Tincher*, Defendant bears the burden of persuasion under the risk-utility standard of proof. (Doc. 46, p. 7). While the court in *Tincher* considered "whether Pennsylvania should . . . require a shifting of the burden of proof to the defendant when the plaintiff proceeds upon a risk-utility theory", it concluded that the "ultimate answer to the question best awaits balancing in an appropriate

6

explaining the risk-utility standard of proof, the court in *Tincher* noted that "jurisdictions have generally cited favorably the works of Dean Wade, which articulated factors relevant to the manufacturer's risk-utility calculus implicated in manufacturing or designing a product." *Id.* at 389. In addition to the likelihood and gravity of harm, the above mentioned "Wade factors" relevant to the "risk" side of the test include the user's ability to avoid the danger by exercising care and the user's anticipated awareness of the dangers due to suitable warnings or instructions. *See id.* at 390.[2]

Defendant argues that all relevant factors weigh in its favor. Defendant asserts that Capece's injury was the only known injury of its kind and that the plant where Plaintiff's injury occurred had an accident free rate of 99.99999%. (Doc. 32, ¶ 53; Doc. 45, p. 8). Defendant also claims that Capece could have avoided the hazard by using the pedestrian catwalk, opening the safety gate, turning the announce key, or pressing the emergency stop button. (Doc. 45, p. 9). Defendant further maintains that there is no job duty that requires standing on the conveyor when the Hess Machine is operating. (Doc. 32, ¶ 37). According to Defendant's expert, Capece's "injury was the result of his own carelessness and disregard of the proper use of the . . . safety gate." (Futej Report, p. 33, Docs. 31-6, 31-7).

---

case." 104 A.3d at 408-09. Presently, under *Tincher*, "a plaintiff pursuing . . . a theory of strict liability in tort must prove that the product is in a 'defective condition.'" *Id.* at 335.

[2] Capece argues that these "Wade factors" should not be considered because they are not included among the so-called "*Barker* factors" enumerated in the California Supreme Court's 1978 decision in *Barker v. Lull Engin. Co.*, 20 Cal.3d 413. (Doc. 46, p. 6). The "core insight" of *Barker* that the court in *Tincher* found persuasive was not the factors underlying the *Barker* risk-utility test—which the Pennsylvania Supreme Court did not mention— but rather *Barker's* alternative standard of proof that complemented the risk-utility test with a consumer expectations test. *Tincher*, 104 A.3d at 390-91, 401-02.

7

Capace disagrees with Defendant's characterization of the facts and argues that the gravity and likelihood of harm, and adequacy of safety measures, present factual issues for a jury to consider in applying the risk-utility test. (Doc. 46, pp. 4-5, 8).

According to Capece, despite Defendant's assertion of a near-perfect accident rate at the plant, Defendant's corporate representative testified that three accidents involving Defendant's concrete machines have occurred in the past ten years in other plants, including one that resulted in the death of an employee in Russia. (Doc. 39, ¶¶ 13, 53).

Furthermore, Capece disputes the availability of other options for safely crossing over the conveyor. With respect to Defendant's contention that Plaintiff should have used the pedestrian catwalk located outside the Hess Room that crosses over the conveyor (*see* Doc. 32, ¶ 36; Doc. 39, ¶ 36), Capece disagrees with Defendant that this walkway was located "just outside" of the Hess Room and states that using the walkway was not a practice followed by the workers because it slowed down operations. (Doc. 39, ¶¶ 35, 36). Plaintiff also cites fact and expert testimony indicating that workers commonly crossed the unguarded portion of the conveyor in the Hess Room, and argues that it was therefore foreseeable that workers would cross the conveyor in front of the plate ejection site in order to save time and increase production, thereby increasing the likelihood of harm and rendering the machine unreasonably dangerous. (Doc. 39, ¶ 35; Doc. 40, pp. 19-20; Doc. 46, p. 5).

8

As to the "probability and seriousness of harm" caused by the Hess machine, Capece further disputes that the emergency stop button and announce key on the safety gate were adequate safety measures. (Doc. 40, p. 31; *see also*, Doc. 32, ¶¶ 40-45; Doc. 39, ¶¶ 40-45). Pressing the emergency stop button shuts down power to the machinery and prevents plate ejection onto the conveyor. (Doc. 32, ¶ 40; Doc. 39, ¶ 40). Turning the announce key allows plate ejection to continue until the machine completes the current cycle. (Doc. 32, ¶¶ 41-42; Doc. 39, ¶¶ 41-42). Capece asserts the emergency stop button was not a safety measure under the circumstances because it shut down the entire plant and therefore was only meant to be used in true emergencies. (Doc. 39, ¶ 40). With respect to the announce key, while Defendant states that turning and removing the key shuts down the machine and renders plate transfer impossible, thereby eliminating the risk of injury (Doc. 32, ¶¶ 41, 42, 45), Capece argues that the key was not a reasonable safety measure because it did not shut down the machine until the current cycle was completed and that workers did not actually use the key. (Doc. 39, ¶¶ 41, 42, 45).

Capece also disputes Defendant's assertion that the windows in the Control Room overlooking the conveyor belt provide an additional safeguard. Defendant claims that when the machine is in manual mode, a worker could communicate with the machine operator located in the control room to ensure that a plate would not be sent onto the conveyor until the area is clear. (Doc. 32, ¶¶ 34, 43). Plaintiff argues that verbal communication was not possible, nonverbal communication was not always possible due to visual impairments, that

9

there is always the possibility of a miscommunication, and that reliance on communication does not constitute an effective safety device. (Doc. 39, ¶¶ 31, 34, 43).

Finally, Capece argues that the safety gate was not an adequate safety mechanism. (Doc. 40, p. 20). Defendant asserts that every fact witness who was deposed testified that opening the safety gate prevents the Hess Machine from sending a plate onto the conveyor until the gate is closed and the confirm button is pressed. (Doc. 32, ¶¶ 64, 65). Tobias Hess, Defendant's corporate representative, testified that while the control unit has power going to it when the safety gate is open, no power is going to the machine to operate it. (Doc. 32, ¶ 65; Hess. Dep., p. 109:1-3). Hess further testified that opening the door shuts off the hydraulics, the machine, and the conveyor. (Hess Dep., p. 91). However, Capece asserts that the safety gate could be closed and the confirm button pressed while another worker was in the danger zone, as allegedly happened in this case. (Doc. 39, ¶ 46). Furthermore, Capece states that opening the safety gate does not remove power to the control unit and the machine can operate in manual mode while the safety gate is open. (Doc. 39, ¶ 65; Hess Dep., pp. 101, 109). According to Capece's expert, Bartley Eckhardt, a plate could still be ejected while the safety gate is open when the machine is in manual mode. (Eckhardt Dep., p. 23:10-13). Eckhardt also opined that if opening the safety gate *completely* shuts down the machine, which Plaintiff contends is not the case here, and makes it impossible to eject a plate, then the hazard "goes away." (Doc. 32, ¶ 66).

Capece has thus raised genuine disputes of material fact regarding the probability and seriousness of harm and the related issue of the adequacy of the Hess machine's safety measures. Whether the "probability of harm" should be based on the frequency of unguarded crossings or instead on the number of machine cycles cannot be resolved on summary judgment. Nor can the potential for the seriousness of harm as a result of the Hess Machine's current design. There also exists a genuine issue as to the adequacy of the alternative safety measures.

Under the risk-utility test, a plaintiff must also introduce proof of the "burden or costs of taking precautions" against the harm. *See Tincher*, 104 A.3d at 335, 406. The availability of a safer substitute product is a relevant consideration. *See id.* at 389.

Defendant argues that summary judgment is appropriate because Capece's proposed alternative design calling for an interlocking safety gate would not have prevented the injury. (Doc. 45, p. 8). In response, Capece contends that adding a fixed and interlocked barrier fence along the conveyor and an additional catwalk over the conveyor is a feasible and safer alternative design. (Doc. 46, pp. 3, 5).

The parties therefore dispute whether Capece's proposed alternative would have prevented Capece's accident. (Def. Supp. Br., Doc. 45, p. 8; Pl. Supp. Br., Doc. 46, pp. 5-6). Capece's expert, Eckhardt, opined that a fixed and interlocked barrier fence along the conveyor, and an additional walkway over the conveyor inside the Hess Room, is a feasible, effective, and safer alternative design that would have prevented Capece's accident. (Doc.

46, pp. 5-6; Eckhardt Report, pp. 20-24). Under Eckhardt's alternative design, crossing the conveyor without using the catwalk would require removing a section of the interlocked fence thereby automatically shutting down the machine. Because Defendant's expert disagreed about the feasibility and efficacy of Eckhardt's proposal (*see* Futej Report, p. 31, Docs. 31-6, 31-7), this is a dispute of fact requiring resolution at trial. *See Hoffman v. Paper Converting Mach. Co.*, 694 F. Supp. 2d 359, 365-66 (E.D. Pa. 2010) (explaining that conflicting expert opinions on feasibility of alternative design was not susceptible of resolution at summary judgment stage).

Plaintiff has also created a triable issue of fact as to the utility of the Hess Machine and the consequences of taking additional safety precautions. Defendant claims that the hazard at issue could not be designed out. (Doc. 32, ¶ 22). Defendant also cites testimony regarding the usefulness, reliability, and profitability of the machine as presently designed. (Doc. 32, ¶¶ 13-17). However, Capece contends that the hazard of plate ejection could have been guarded against without adversely impacting the utility of the machine. (Doc. 46, p.5). According to Eckhardt, the cost of these precautions would not exceed 5% of the original sales price of the Hess Machine. (Eckhardt Report, p.23; Eckhardt Dep., p.155-6).

As a result, Capece has set forth facts and supporting materials that raise a genuine dispute regarding the feasibility, effectiveness, and costs of taking precautions. Eckhardt provided cost estimates for his alternative design. Rational jurors could disagree about the feasibility of an alternative design, whether an alternative design would have been more

effective, or could even have prevented Capece's injury, whether Eckhardt's estimate of a 1% to 5% increase in the manufacturing cost of a machine that would otherwise sell for approximately one million dollars is an unreasonable cost, or whether the probability and seriousness of harm caused by the machine outweigh the cost of taking such precautionary measures.

Defendant nevertheless argues that summary judgment is warranted based on Eckhardt's alleged misunderstanding of whether a plate could be ejected when the safety gate was open. According to Defendant, Eckhardt's "entire theory of defective design is based upon a false, critical premise" that when the gate is open plate ejection could occur if the machine is in manual mode. (Doc. 30, pp. 27-28). As an initial matter, the operational characteristics of the machine present factual issues that cannot be resolved on summary judgment. Defendant's corporate representative Hess gave testimony as to whether the machine, the conveyor, or both can continue to operate in manual mode when the safety gate is open. (*See* Hess Dep., pp. 101, 108-09). Eckhardt based his opinion, in part, on Hess's testimony. (Eckhardt Dep., p. 79-80). In light of Hess's testimony, the mechanical and electrical configuration of the machine is an issue for trial.

Under *Tincher's* risk-utility test, "proof of risks *and utilities* are part of the burden to prove that the harm suffered was due to the defective condition of the product." *Tincher*, 104 A.3d at 407 (emphasis added). In explaining the risk-utility standard of proof, the court in *Tincher* referenced Dean Wade's factors, which include the "usefulness and desirability of

the product—its utility to the user and to the public as a whole" and the "manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility." *Id.* at 389-90.

Defendant argues that consideration of the utilities also weigh in its favor. (*See* Doc. 45, pp. 8-9). Eckhardt, Capece's expert, opined that the risk of harm could not be "designed out." (Doc. 30, p. 5; Eckhardt Report, p. 9). Defendant also points to evidence regarding the usefulness and reliability of the Hess Machine. (Doc. 30, p. 38). According to Michael Nadeau, Defendant's Chief Operating Officer, the Hess machine enabled Techo-Bloc to double its output. (Nadeau Dep., p. 23). Nadeau considers Hess to be a "premier manufacturer" of concrete molding machines and believes the Hess Machine is the "best production equipment in the industry." (*Id.* at 25-26, 30-34). Finally, Nadeau attributes an increase in Techo-Bloc's profits and productivity in part to the Hess Machine. (*Id.* at 25-26).

Capece responds by arguing that adding a fixed and interlocked barrier fence along the conveyor would not disturb the utility of the machine. (Doc. 46, p. 5). Eckhardt opined that his proposed guarding system and catwalk are "technically and economically feasible and would not have defeated the utility of the machine." (Eckhardt Report, p. 23). Under Eckhardt's design, each section of the interlocked guarding system is "readily removable" in order to allow access to the machine. (Eckhardt Supp. Report, p. 4, Doc. 41-5). Eckhardt concludes that the "utility and functionality of [the] alternative design is the same as that provided by Hess." (*Id.*).

The impact of the alternative design on the machine's utility is a question of fact for the jury. Although Eckhardt stated that "the specific hazards could not be designed out," he also opined that those hazards "should have been guarded against." (Eckhardt Report, p. 9). Eckhardt then proposed an alternative guarding system that he claims would not have impacted the utility of the Hess Machine. Defendant, for its part, produced evidence of the usefulness, reliability, and productivity of the Hess machine. The extent of any change in the utility of the machine resulting from Eckhardt's proposal is a factual issue for the jury to consider when applying the risk-utility test.

The Court concludes that there is a genuine issue for trial as to whether the Hess Machine was in a "defective condition" under a risk-utility test. There are factual disputes regarding the risks of harm from the machine as presently designed, the feasibility and effectiveness of a safer alternative design, and the alternative design's effect on the product's utility. These disputes are material because they go the "probability and seriousness of harm" and "the burden or costs of taking precautions." Accordingly, summary judgment is inappropriate with respect to the strict liability design defect claim (Count II). Since Defendant did not address the elements of a negligence action, summary judgment is also inappropriate with respect to the negligent design claim (Count I).

Capece's negligence (Count I) and strict liability (Count II) claims are also premised on a failure to warn theory. (Doc. 1-2, ¶¶ 19(d)-(g), 21, 24). In Pennsylvania, liability for

15

failure to warn may attach when the product contains a defect and "was distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Sikkelee v. Precision Airmotive Corp.*, 876 F. Supp.2d 479, 492 (M.D. Pa. 2012) (quoting *Donoughe v. Lincoln Elec. Co.*, 936 A.2d 52, 61–62 (Pa. Super. Ct. 2007)). As previously stated, Plaintiff has raised genuine issues of material fact as to whether the Hess Machine was defective. Therefore, at issue here is whether Capece has put forth sufficient specific facts to create a triable issue of fact as to Defendant's assertion that the adequacy of the safety warnings is undisputed. (*See* Doc. 30, p.2; Doc. 32, ¶¶ 47-52; Doc. 39, ¶¶ 47-52).

The parties agree that Defendant provided Techo-Bloc with the General Safety Instructions for the Operation of Concrete Block Machines prior to the completion of the installation of the Hess Machine, and that these instructions warn of the risk of injury association with moving parts. (*Id.* at ¶¶ 47-48). However, Capece argues that the warnings and instructions offer a low order of protection, are no substitute for providing a safe design, and cites testimony indicating that workers did not read the safety instructions. (Doc. 39, ¶¶ 48, 50, 63). Plaintiff also places at issue Defendant's claim that lights and horns warned workers when the machine was about to start up under certain circumstances (Doc. 32, ¶ 52) by noting that there are no light signals inside the Hess Room and that there is no testimony that a horn sounded in the present case prior to Capece's injury (Doc. 39, ¶ 52). Accordingly, the sufficiency of the warnings is an issue for trial.

## B. Count III: Breach of Warranty

In Count III of the Complaint, Capece alleges that Defendant breached implied and express warranties. Capece states in his brief in opposition to summary judgment that the parties have stipulated to the dismissal of the breach of implied warranty claim as time barred. (Doc. 40, p. 3). While Defendant asserts in its brief in support of the motion that Capece has agreed to withdraw his breach of express warranty claim (Doc. 30, p. 42), there is nothing on the record to establish the plaintiff's voluntary relinquishment of this claim.[3] Because neither party directly addressed the issue of Plaintiff's breach of express warranty, the Court will not grant summary judgment as to this aspect of Count III. The parties may submit a signed stipulation at any time prior to trial should Plaintiff agree that this claim is time-barred.

## V. CONCLUSION

Based on the foregoing considerations, Defendant's Motion for Summary Judgment (Doc. 18) will be granted as to Plaintiff's breach of implied warranty claim in Count III and denied in all other respects. A separate Order follows.

Robert D. Mariani
United States District Judge

---

[3] Defendant attaches as Exhibit O a letter indicating that an oral agreement was reached between the parties as to Plaintiff's breach of express warranty claim and an unsigned stipulation dismissing Plaintiff's claim and advises the Court that a signed stipulation is forthcoming. (Doc. 30, p. 42; Doc. 31, Ex. O). However, Plaintiff does not address this assertion in his brief in opposition to Defendant's motion for summary judgment and no stipulation has been filed of record as of the date of this Memorandum Opinion.